*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Q. COGER, Minor.

UNPUBLISHED
October 20, 2022

No. 360893
Calhoun Circuit Court
Family Division
LC No. 2021-003088-NA

Before: K. F. KELLY, P.J., and BORRELLO and CAMERON, JJ.

PER CURIAM.

In this child protective proceeding, mother appeals as of right the trial court's order terminating her parental rights to her minor child, QC, under MCL 712A.19b(3)(b)(*i*) (parent's act caused physical injury or abuse), (j) (reasonable likelihood of harm if returned to parent), (k)(*iii*) (parent's abuse of child included torture or severe physical abuse), and (k)(*v*) (parent's abuse of child included life-threatening injury). For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

QC was removed from mother's care after mother brought the 13-month-old child to the hospital with severe burns on his legs, hands, and genital area from hot water in the bathtub. A doctor diagnosed these injuries as resulting from child physical abuse. The Department of Health and Human Services (DHHS) submitted a petition seeking to terminate mother's parental rights to QC. The petition alleged that on October 31, 2021, mother took QC to the hospital with severe burns to his legs, hands, and genital area. According to the allegations in the petition, mother claimed that she had left QC in the bathtub for approximately 4 or 5 minutes, that she had felt the water to make sure it was lukewarm, that QC had turned the hot water on while she was gone, and that she returned to find QC on the bathroom floor crying and with severe burn marks on his entire lower body and left arm. Mother believed that QC could have climbed out of the tub because he had become very mobile.

The petition further alleged that when QC was examined by child abuse specialist Dr. Sarah Brown the following day, mother told Brown that she had left the water running while she walked out of the bathroom and that she heard QC crying and climbing out of the tub while she was out of the room. The petition alleged that mother also told Brown that when she returned to the bathroom, QC was on the bathroom floor, his legs appeared "red," his feet were bleeding, and he

-1-

was "already missing skin from his knees down." QC also had blisters on his hands by the time he and mother arrived at the hospital. Brown concluded that the pattern of burn marks on QC did not match mother's description of what happened, and Brown "diagnosed child physical abuse with 30-35% body surface area burns with partial thickness."

There were additional allegations in the petition that mother had subsequently admitted to police that she had turned the water on in the bathtub while QC was already in the tub, that she walked away from the bathtub with the water running, and that she did not check the water temperature before leaving the bathroom. Mother also allegedly admitted to police that she heard QC crying when she left the room and that his crying later turned into screaming. Additionally, the petition contained further allegations that mother told police that the water temperature in her apartment is 125 degrees Fahrenheit and that she had spoken about the issue with management in the past. Mother allegedly had a history of domestic violence and substance abuse as well as a history of drug abuse involving cocaine and methamphetamine.

An amended petition was subsequently authorized that additionally alleged that mother been physically present with QC in the hospital but did not appear to show interest in comforting QC, despite prompting from medical staff. QC was reportedly happier when mother was not in the room. Further police interviewing allegedly resulted in mother admitting that when she placed QC in the bathtub and walked away, QC was screaming and she did not do anything about it. Mother was charged with first-degree child abuse based on the incident.

An adjudication bench trial was held. Cody Longon, a detective with the Battle Creek Police Department, testified that he interviewed mother on November 2, 2021. According to Longon, mother told him that she was giving QC a bath on the day of the incident because QC, who was 13 months old, had "pooped himself" and mother's friend was coming over to pick them up to go grocery shopping. Longon continued:

> [S]he told me that she had to get him cleaned up so she turned the water on, she first explained that she tested the water and then later on told me that she just turned the water on. She let it fill up for about five minutes and then she placed [QC] into the bathtub and he began to cry. She said that she walked away and the tub was still filling up for about another four or five minutes and when she came back in she -- she said he was aggressively screaming and he was on the floor at this time. She picked him up and she realized that uh -- he was like screaming violently and she thought uh -- his hands and feet had uh -- toilet paper around it but realized it was skin and that's when she knew he was burnt. She called her friend and said hurry up um -- and her friend advised her to put mustard on the wounds until she could get there. She then immediately took her to Bronson Kalamazoo Hospital where he was treated.

Longon indicated that the child was completely unattended in the tub and screaming for about 4 to 5 minutes while mother was out of the bathroom. There were no other adults present in the home. When Longon saw QC in the hospital, QC was "bandaged up from basically the waist down and then from his elbows down from his burns." Longon testified that QC was "in a lot of distress" and "in a lot of pain."

Dr. Sarah Brown testified as an expert in pediatric medical care. She first evaluated QC at the hospital on November 1, 2021. QC was in the pediatric intensive care unit with serious burns. In describing the extent of QC's injuries, Brown explained that he had very severe burns on his feet and ankles, as well as "somewhat less severe burns but still very serious injuries" up the remainder of his legs. QC also had burns on his hands and wrists. The child required morphine for pain control and "conscious sedation" in order to treat his injuries. Brown further testified:

His feet were so severely burned that all of us were concerned that he was going to lose some of his toe tissue. In the end I do not believe that he lost any bones um -- within his toes. But he continues to this day to have uh -- third degree or full thickness burns that have not healed on his feet and ankles.

Longon testified that he viewed the scene of the incident, explaining that

after we got done interviewing [mother] that day, we actually uh -- she needed to go back to the house so we gave her a ride to the house. We asked if we could just look around uh -- we went into the house and then I went into the bathroom and noticed that there was still skin and bodily fluids on the -- the rim of the tub as -- and it looked as -- it appeared to be like hand marks from a small child. And so it looked like he -- the skin marks were trying to crawl -- you could actually see another spot where it looked like maybe a foot hooked over the railing to get out of the tub. And then on the floor there was also bodily fluids, skin left on the floor.

Longon subsequently went back to the apartment[1] and conducted

a water test because she had told us that the water heater was hot. Too hot for her. She actually at one point told us that the water temperature she had burned her hands previously. And before -- actually, let me back up a little bit. When she was in the interview, she explained that she knows the water gets extremely hot. She had burned her hands before. So she knows how hot the water can get. She said the water heater is hot. So we went to there. We met up with the maintenance man. I contacted um -- the property manager first and I got the land err -- the uh -- maintenance man. We then went downstairs, we checked the water heater. It is set at 120. We went upstairs and then we did a water test. So in that water test what we did is we did exactly what she told us she did. We turned the water on hot like she did for five minutes until it filled up to about four or five inches. We tested the water temperature after six minutes and it was 137 degrees. Um -- after that -- after the six minutes, we continued to fill up the tub to about seven or eight inches and we -- we documented all this, and at the seven or eight inch mark, it took about another four and a half minutes and the water that was coming out was coming out at 145 degrees. The water after filling up to about seven or eight inches we directly put the temperature gauge in and that was measuring at 140. 140 degrees Fahrenheit. Uh -- which is extremely hot for a child.

---

[1] On this occasion, Longon was executing a search warrant.

Longon interviewed mother again, and her story changed somewhat:

> Uh -- she did say that the second she -- when the differences were when um -- she said she turned the water on she was frustrated but not at the baby. She said that she did turn the water on uh -- completely on high and changing her story from she checked the water and turned it to lukewarm and he must have got up and turned the water on himself. She said she just turned it on and -- and as soon as the water filled up to a certain level, she just put the uh -- [QC] into the tub and walked away as he was crying violently. She said she still left for four or five minutes and when she came back he was out of the tub, had crawled out himself and he was on the floor screaming.

Brown testified regarding mother's explanation of the incident and why she believed it was not consistent with the nature of QC's injuries:

> *Q*. And what was the explanation from the mother of how the burns were received?
>
> *A*. The first time that I talked to his mother . . . she told me that she had um -- drawn him a bath because he had got diarrhea and there was a large mess. . . . that first she had placed him in the tub um -- and used the water to clean away the feces but not allow water to accumulate in the tub. After she had gotten the material off of him she then cleaned out the tub and drew water in the tub of an appropriate lukewarm temperature. She left the water running and then exited the bathroom to attend to other matters.
>
> *Q*. And is that explanation consistent with the injuries that you observed that day?
>
> *A*. It is not.
>
> *Q*. Can you tell the Court why you believe that?
>
> *A*. Lukewarm water or water that's an appropriate temperature for bathing would not cause burns. Mom's uh -- stated belief at the time that I first talked to her um -- was that [QC] himself had turned the water hotter and that um -- hot water had been mixed with the lukewarm water in the tub causing his burns. However, the amount of water that she described in the tub of the appropriate temperature she estimated five inches and then um -- the amount of water she estimated that accumulated while she was out of the bathroom she thought that it went up to about eight inches, that would be less than a 50/50 mix meaning um -- you know, it was more lukewarm water then hot water. So even if the hot water was very -- very hot I was very concerned that the overall water temperature in the tub still would not have gone high enough to cause the severity of [QC's] burns.

Brown testified that she was informed at some point that police had found the water at the bathtub faucet in mother's apartment to be approximately 140 degrees. Brown stated that "water in the 140's produces burns almost immediately on contact with human skin" and that "it only

-4-

takes maybe a few or several seconds of contact with water in the 140's to produce full thickness or third degree burns." Brown was also informed that police had found what "appeared to be a very clear pattern on the tub of skin that was transferred from [QC's] body to the surface of the tub demonstrating how he self-exited the tub." Brown believed it would have been possible for QC to climb out of the tub himself based on the information received from law enforcement and QC's developmental abilities observed at the hospital. She opined that the child must have been very distressed and in significant pain to prompt him to climb out of the tub, and she was concerned that QC needed to "rescue himself" instead of being helped by his caregiver.

Brown further testified that she was also provided with information at some point that mother had admitted that the water may have been very hot when she first drew the bath, that QC began to scream as soon as mother placed him in the bath, and that mother chose to leave the bathroom despite QC's screaming. Brown opined that this explanation was "far more consistent" with QC's injuries than mother's original explanation to Brown. Although Brown believed it was possible that QC was capable of manipulating the faucet apparatus such that he could have made the water hotter, Brown opined that the additional information she received "clarified that [QC] was put into water that was very hot." Brown elaborated on direct examination:

> *Q.* And you talked about um -- the injury patterns and what you observed and -- and different burns in different places, are those also consistent with him being able to self-exit verses sitting in the hot water fully submerged?
>
> *A.* Yes. Perhaps I should speak a little bit more about what I saw on his body. The severity of his foot and ankle burns showed me that he spent the most amount of time in the hot water in a standing position and that the depth of water was consistent with moms [sic] description about five inches. Because the -- there was a very clear line of worse burn at about five inches up from the sole of his foot. The remainder of his burns going up the backs of his legs and all the way up to his genital area were less severe and I believe that that pattern clearly indicated that at some point he had sunk um -- his bottom being very close to the water or his genitals being in the water sort of in a squatting position. The um -- fronts of his lower legs and the fronts of his knees were burned and then his hand burns, his hand and wrist burns, were less severe but indicative that he had um -- pushed his hands down probably to the bottom of the tub and then pushed back off again. What I'm not able to determine medically is whether he start -- started out in the squatting position and pushed off and then stood for some time and got out or whether he was placed in a standing position or got in in a standing position and at some point sunk down and (inaudible) --

Brown discussed the medical terminology for different types of burns, and she then explained the medical diagnosis of the severity of QC's burns:

> So in talking about first, second, and third degree that is actually some old terminologies. So we steer away from it. I usually reference it because people are more familiar with it . . . . A full thickness or third degree burns mean that all of the skin tissue has been damaged by the burn. All of it um -- will eventually be sloughed away or cleaned away by the medical team because it all has died. This

means that the underlying surfaces such as the fat and muscle um -- could be exposed. It puts patients at risk for fluid imbalances, meaning they can lose a lot of body fluid from those areas of injury. It also puts them at risk for infection. Your uh -- epidermis or the epidermal layer of your skin, that top covering is very important to preventing infections coming into your body . . . . [QC's] . . . feet and ankles were full thickness burns or third degree burns meaning all of his skin tissue is gone. He received a treatment um -- those areas being covered with someone else's donated skin tissue for some time with the purposes of um -- allowing his body to have the opportunity to regrow its own skin. Those um -- skin grafts um -- from someone else, donated tissue were then removed before the end of his hospitalization. And there is continued hope that he will regrow his own skin tissue without additional skin grafting. But what ultimately is going to happen with his most severe burns is still not clear.

However, Brown continued,

I would point out that he's already 60 days plus out from his injury and so uh -- most children have already be completely healed their severe burns in this amount of time. That speaks to the severity of his original injury. And I think also places him at increased risk for ultimately needing more skin grafting.

It concerned Brown that a 13-month-old child was left unattended in the bathtub for 5 minutes because of the risk of drowning and because most caregivers, even those of "pretty limited capacity," understand the dangers of drowning and hot water. Brown was further concerned "that mom stated to me that she knew how hot their water got um -- that regularly she would become uncomfortable with washing dishes and that sort of thing." Brown explained:

In my experience even my significantly cognitively impaired parents have a really good understanding of hot water being a risk for burns. It's something that's so experiential right, you can feel the hot water in the tap and know that your own hands are uncomfortable.

According to Brown, QC's injuries would have been even more significant if he had not managed to get himself out of the bathtub because "[b]urns and the depth of burns are directly related to the temperature of the exposure times the duration of exposure. So any additional seconds that he would have spent in the time would likely have resulted in more severe injury." Brown opined, "I believe that burns of this amount of area on his body and burns of this depth are life threatening in the sense that if he was not in ICU receiving critical care that it very well could have been life threatening." QC also suffered infections.

Brown testified that at the time of the adjudication trial, QC was still receiving treatment and therapies for his healing burns and to prevent scars from forming in a way that would limit his mobility. QC had been in the intensive care unit for approximately 28 days "because he needed sedation for his dressing changes every day and that sedation is only provided in the ICU." Brown opined that the severity of the burns on QC's feet and ankles would "lead to long term and likely life time scaring," which could in turn lead to discomfort and functional complications across his

lifetime that would require surgical procedures and therapies. Brown also opined that there was a risk that QC would suffer from post-traumatic stress disorder (PTSD).

DHHS worker Abbey Smith testified that the DHHS was requesting that the court take jurisdiction and terminate mother's parental rights to QC. Smith did not think that QC could be safely placed back in mother's care given the nature of the injuries he suffered.

At the conclusion of the adjudication trial, the trial court found that mother physically abused QC by purposely placing him in a bathtub of hot water, knowing that the water in her apartment could get so hot that it could cause burns, and leaving him unattended for more than five minutes while she ignored his screams. The trial court further found that QC had suffered life-threatening third-degree burns that caused his skin to peel off, had suffered infections, and was likely to suffer lifelong injuries. The trial court found that mother's initial explanation that the incident was an accident were not credible and were inconsistent with the evidence. Accordingly, the trial court found that the statutory grounds for jurisdiction had been satisfied. The disposition was adjourned to allow the child's father to establish legal paternity and for father's adjudication.[2]

At a subsequent hearing, the trial court addressed the issue of mother's parenting time pending the disposition hearing. Laura Fennelly, the worker who supervised mother's parenting time, testified that she recommended suspending mother's parenting time. According to Fennelly, Brown had reported that QC was happier in the hospital when mother was not present and that mother was "not sympathetic towards the child" when visiting QC in the hospital. Brown had concerns that seeing mother could be traumatizing to QC since she was the cause of his injuries. Fennelly also testified that mother attended the child's recent medical appointments via Zoom due to COVID-19 protocols, but mother was disruptive by cursing at Fennelly in the waiting room while QC was present and refusing to turn the television off or mute herself during one of the actual appointments. Fennelly believed mother's behavior could be harmful to QC's mental health. QC's foster mother was present at the medical appointment at the burn clinic, learning about how to care for the child's wounds. However, there was also documentation of positive parenting time interactions between mother and QC.

The trial court found that mother's behavior was concerning during the most recent visits involving the child's medical appointments. The trial court further found that mother was unable to control her emotions and behavior in the presence of QC, that mother was so focused on herself that she could not refrain from disrupting the child's medical appointments, and that mother was unable to focus on the child's extreme medical conditions and needs that were caused by mother's initial actions in this case. Consequently, the trial court found that parenting time with mother would be harmful to QC and that mother's parenting time would therefore be suspended pending the termination hearing.

At mother's disposition and termination, Fennelly testified that QC was still going to physical therapy and the burn clinic, but that he could possibly be discharged from the burn clinic "soon." Most of QC's burns had healed, but the most severe burns on his feet still had not fully healed. With respect to services, mother was participating in random drug screens, had completed

---

[2] Father's parental rights are not at issue in the instant appeal.

a psychological evaluation, and had completed a parenting class. Mother had two positive screens for marijuana, and she had been diagnosed with substance abuse dependency. Fennelly had not noticed any negative impact on QC from suspending mother's parenting time. QC's foster home was a pre-adoptive placement and was meeting all of his needs. Fennelly testified that termination of mother's parental rights was still recommended and in QC's best interests because of QC's initial injuries, QC's extensive medical needs that would continue throughout his life, QC's mental health needs, the need to prevent QC from being subjected to the potential for further abuse and neglect by mother, and the need to prevent QC from being exposed to ongoing substance use.

The trial court first found that termination of mother's parental rights was warranted under MCL 712A.19b(3)(b)(*i*) because there was clear and convincing evidence that mother had physically abused and injured QC and that there was a reasonable likelihood that the child would suffer abuse or injury in the foreseeable future if placed in mother's home. In support of this conclusion, the trial court relied largely on the evidence introduced at the adjudication hearing and the trial court's findings that there was clear and convincing evidence that mother physically abused QC by knowingly and purposely placing QC into a tub of extremely hot water, after which she left him unattended and screaming for over 5 minutes until he suffered burns so severe that his skin was falling off. The trial court further found that the child suffered life-threatening injuries and third-degree burns, that the child's injuries would have been even worse had he not been able to crawl out of the tub by himself, that the child suffered torture as the result of mother's actions, that mother's initial explanations were inconsistent with the evidence, and that the child was likely to suffer lifelong effects from these injuries and PTSD. The trial court further relied on the psychological report admitted at the termination hearing indicating that mother lacked parenting skills, lacked an understanding of her own conditions, abused substances, and had an elevated score for risk of committing child abuse. Additionally, the trial court found that mother had demonstrated a lack of sympathy for the child based on the observations of Brown.

Next, the trial court found that there was clear and convincing evidence that MCL 712A.19b(3)(j) had been established as a ground for termination. The court found that there was a reasonable likelihood that the child would be harmed if returned to mother based on its findings that mother's act was intentional, that even a cognitively challenged parent would understand the dangers presented by the situation in which mother left QC, and that mother was so focused on herself that she could not focus on the needs of the child.

The trial court next found that termination was proper under MCL 712A.19b(3)(k)(*iii*) and (*v*). The court found by clear and convincing evidence that mother abused the child in a manner that constituted torture and severe physical abuse because she intentionally left the child in the bathtub screaming in pain and did not come back. The court further found that QC suffered life-threatening injuries because child would have died if he had not been able to save himself by crawling out of the tub and was subject to unusually prolonged medical treatment due to the severity of the injuries.

Finally, the trial court found that termination of mother's parental rights was in the child's best interests. The trial court found that given the severe nature of the abuse and the conclusions in mother's psychological evaluation report, mother would not be able to parent the child without putting him at severe risk of harm. Further, the trial court found that mother had not been sympathetic to QC, that QC was happier when mother was not present, that mother had been

disruptive during QC's medical appointments, that mother had made no effort to learn about the medical treatment QC needed, and that the court had suspended mother's parenting time based on her interference with the child's serious medical treatment. The trial court also found that QC needed permanence and stability immediately, in light of the child's age and serious medical conditions, and that QC was in a supportive pre-adoptive foster home that could meet his needs.

Accordingly, the trial court terminated mother's parental rights. This appeal followed.

## II. ANALYSIS

On appeal, mother argues that the trial court clearly erred by terminating her parental rights. She challenges both the statutory grounds and best-interest findings.

This Court reviews for clear error the trial court's decisions regarding both the existence of statutory grounds for termination and the best interests of the child. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). The trial court's underlying factual findings are also reviewed for clear error. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). "A finding is clearly erroneous [if] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted; alteration in original).

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). The trial court in this case found that there was clear and convincing evidence to establish grounds for termination under MCL 712A.19b(3)(b)(*i*), (j), (k)(*iii*), and (k)(*v*). MCL 712A.19b(3) provides in relevant part as follows:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:
>
> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.
>
> * * *
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

(k) The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent:

* * *

(*iii*) Battering, torture, or other severe physical abuse.

* * *

(*v*) Life-threatening injury.

Here, there was record evidence that mother put QC into a bathtub of hot water and left him in the tub with the water running while she left the room, knowing from her own experience that the water in her apartment could be hot enough to cause burns. The evidence also reflects that mother ignored QC's crying and screaming while she was out of the room. QC may have begun crying or screaming as soon as mother placed him in the water. Regardless, there was evidence that mother admittedly heard his screams and did nothing in response. Only after returning to the bathroom to find that QC had crawled out of the bathtub by himself and that his skin was peeling off, did mother take responsive action. QC suffered full thickness burns, meaning that the burn affected the entire thickness of his skin to the fat and muscle tissues beneath. Brown testified that the child's injuries could have been life threatening had he not received the necessary treatment in the intensive care unit.

Given the extreme severity of the injuries QC suffered due to mother's actions and her demonstrated indifference to his signals of distress, which prolonged his exposure to the hot water and increased the severity of his burns, as well as the evidence in mother's psychological report that she denied any personal responsibility for the incident, the trial court did not clearly err in finding that mother subjected the child to severe physical abuse resulting in life-threatening injury and that there was a reasonable likelihood that the child would be abused, injured, or otherwise harmed if returned to mother's care. Accordingly, the trial court did not clearly err by finding that statutory grounds for termination had been established under MCL 712A.19b(3)(b)(*i*), (j), (k)(*iii*), and (k)(*v*). *In re Mason*, 486 Mich at 152.

On appeal, mother argues that the evidence should have been viewed differently and actually supported her claim that the child's burns were the result of an accident. However, this argument ignores the deference an appellate court gives to the findings of the trier of fact, which "has the advantage of being able to consider the demeanor of the witnesses in determining how much weight and credibility to accord their testimony." *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). Here, the trial court found that mother's claim of accident was inconsistent with the evidence, crediting that conclusion to what Brown provided in her testimony. Review of the record does not lead to a definite and firm conviction that the trial court made a mistake in its findings, and thus there is no clear error. *In re Mason*, 486 Mich at 152.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts Minors*, 297 Mich App at 40. "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90;

836 NW2d 182 (2013), lv den 495 Mich 856 (2013). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). The focus at the best-interest stage is on the child rather than the parent. *In re Moss*, 301 Mich App at 87. "To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re White*, 303 Mich App at 713 (quotation marks and citation omitted). The court may also properly consider the child's need for safety. *Id*. at 714; *In re VanDalen*, 293 Mich App at 141-142.

Here, the record evidence reflected that the young child suffered very severe burns when his mother gave him a bath and ignored the known potential danger of the hot water and the child's screams indicating pain and distress. Furthermore, there was evidence that mother denied any personal responsibility for the child's injuries and failed to demonstrate sympathy for the child's discomfort while the infant was in the hospital. QC was also reportedly happier when mother was not present. Additionally, QC continued to have serious medical needs and would likely suffer complications from these injuries for the rest of his life. In light of this evidence and the young child's need for safety, permanency, and stability, the trial court did not clearly err by finding that termination was in the child's best interests. *In re Mason*, 486 Mich at 152.

Although mother argues on appeal that there was evidence that it was difficult to tell whether a bond existed between mother and QC, the parent-child bond is only one factor to consider. *In re White*, 303 Mich App at 713. Even if a bond existed, that would not outweigh the other evidence that QC was not physically safe in mother's care. See *id*. at 714 (concluding that the trial court did not clearly err by finding that termination was in the child's best interests where the trial court found that a parent-child bond existed but nonetheless gave "strong weight to the children's need for safety and stability"). Accordingly, mother's argument does not demonstrate that the trial court's best interest ruling was clearly erroneous.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello
/s/ Thomas C. Cameron